Keith McKENZIE, et al., Plaintiffs–Appellants,

v.

CITY OF CHICAGO, et al., Defendants–Appellants.

No. 97–2624.

United States Court of Appeals, Seventh Circuit

Submitted July 9, 1997.

Decided July 14, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 4, 1997.

**554**

Daniel A. Edelman (submitted), Michelle A. Weinberg, Edelman & Combs, Chicago, IL, for Plaintiffs–Appellees.

Susan S. Sher, Office of the corporation Counsel, Appeals Division, Chicago, IL, for Defendants–Appellants.

Before POSNER, Chief Judge, and EASTERBROOK and MANION, Circuit Judges.

EASTERBROOK, Chief Judge.

Illinois authorizes its municipalities to "demolish, repair, or enclose" residential buildings, one or two stories in height, that are "open and vacant" and "an immediate and continuing hazard to the community". 65 ILCS 5/11–31–1(e). Chicago adopted an ordinance taking advantage of this power. Municipal Code of Chicago § 13–9–010. The program, which the City calls the Fast Track, begins with an inspection. If the head of the program agrees with the building inspector that the property meets the criteria, the City sends a second inspector to verify. If the building still appears to be open and vacant, the second inspector posts a large, brightly colored notice about impending demolition. Notices are sent by certified mail to all owners of record (including mortgagees), and the City attempts to track down and mail notices to interested persons not of record, such as the beneficial owners of land trusts. Notices are published in a major newspaper. All of the notices give the owners 30 days to repair or enclose (board up) the buildings and warn that if the buildings remain open after that time they may be demolished without further notice. The mailed and published notices also tell the owners that they can obtain a hearing by filing suit in an appropriate court, and that a suit automatically blocks demolition until the judge decides whether the building meets the statutory criteria for demolition. When the time allowed for repairs or enclosure has expired, and if no suit has been filed, the City sends a third inspection team; if that team concludes that the building remains open and vacant, a demolition contract is let. Contractors are under instructions to verify that the building remains open and vacant before they wreck it. Between 200 and 1,000 buildings are leveled per year in Chicago under this program (the record assembled so far in this case contains estimates but not data).

Two persons whose buildings were demolished filed this suit under 42 U.S.C. § 1983 seeking an injunction against continuation of the Fast Track program. Neither of the original plaintiffs appears to have standing to seek prospective relief, because neither claims to own a building at risk of demolition in the future. See *Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The district judge permitted some other persons to intervene as plaintiffs. One of these, Honeywood Development Corp., is in the business of rehabilitating old buildings. Sometimes Honeywood owns (or co-owns) title during renovation, and some buildings in its inventory are at risk under the Fast Track program. At least once, Honeywood rehabilitated a building after the City hired a contractor to demolish it; the renovated building was bulldozed shortly after Honeywood finished its efforts. Because Honeywood has standing to seek prospective relief, we put the other plaintiffs out of mind. The scope of its claims is important to the extent of relief, however. Honeywood's stake concerns only those buildings in which it has a financial interest. Plaintiffs sought to broaden the case by serving as representatives of a class of all owners of residential, one- or two-story buildings in Chicago. To date, however, the judge has not acted on the motion for class certification.

After an evidentiary hearing, the judge issued a lengthy opinion and entered a preliminary injunction halting the operation of

the Fast Track program. The injunction requires Chicago to

> refrain from ordering, authorizing, putting out for bid, or otherwise pursuing any demolition through the Fast Track program, or in any other manner implementing Chicago Municipal Code § 13–9–010 or 65 ILCS 5/11–31–1(e), until further order of this Court. Any Fast Track demolitions that have already been authorized, bid upon, or that are otherwise currently in the hands of contractors must immediately be halted, and the authorizations or contracts suspended.

Two days later City asked the judge to stay this injunction pending appeal. After waiting seven weeks, the judge denied this motion. Now the City asks us to issue a stay pending appeal. We do more than that; we summarily reverse the injunction.

■ The fundamental problem with this injunction is that plaintiffs lack standing to seek—and the district court therefore lacks authority to grant—relief that benefits third parties. "[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs". *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975). Because a class has not been certified, the only interests at stake are those of the named plaintiffs. *Baxter v. Palmigiano*, 425 U.S. 308, 310 n. 1, 96 S.Ct. 1551, 1554 n. 1, 47 L.Ed.2d 810 (1976). Some own properties that may be affected in the future by the Fast Track program, but their interests can be protected by an injunction that prevents the City from demolishing their properties. That is the point of *Lyons*: A wrong done to plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified. Why else bother with class actions? "[T]he scope of the injunctive relief ... is in large part determined by the class action question." *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1072

(7th Cir.1976). The district court wrote that it was appropriate to enjoin the entire program, despite the lack of class certification, in order to prevent the City from violating the Constitution. Opinion at 47 n. 22. This response does not meet the City's objection.* Instead it assumes an affirmative answer to the question at issue: whether a court may grant relief to non-parties. The right answer is no. Sometimes a judge may overhaul a statutory program without a class action; in reapportionment and school desegregation cases, for example, it is not possible to award effective relief to the plaintiffs without altering the rights of third parties. Plaintiffs in this case, however, can be protected by an injunction forbidding fast-track demolition of their properties.

■ As it happens, even such a limited order is unnecessary. Both the state statute and the municipal ordinance forbid demolition of any property once its owner has filed suit. The City believes that this suit, albeit under § 1983, activates that ban. The district judge did not conclude that plaintiffs' properties are at risk while the case is ongoing. So the statutes under attack themselves provide plaintiffs with what they seek: their parcels cannot be demolished until the court rules on the merits. Honeywood notes in its response to the City's motion that it has interests in many properties, and that the City may not know which they are. If so, Honeywood should tell the City what vacant buildings it owns. It is not an appropriate use of judicial power to issue an injunction that adds nothing to the protections plaintiffs already have or can obtain by taking rudimentary precautions, and therefore affects *only* the rights of non-parties.

■ Lest this seem too technical, and lest this case return like a yo-yo as soon as the district judge certifies a class, we add that a preliminary injunction is improvident under the traditional balancing approach. Let us start with the back end of the formula:

---

* It does, however, refute the plaintiffs' contention that the City has waived this point. Chicago made the objection clearly enough that the district judge recognized and addressed it. The City did not need to repeat itself when seeking a stay. Moreover, as we point out in the text, the injunc-

tion exceeded the district judge's powers under Article III of the Constitution; this is something a court of appeals must rectify whether or not the parties paid adequate attention to the subject in the district court.

whether irreparable harm to the plaintiffs if an injunction is erroneously denied exceeds the irreparable harm to the defendant if an injunction is erroneously issued. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987); *Flower Cab Co. v. Petitte,* 685 F.2d 192, 193–94 (7th Cir. 1982). When issuing the injunction, the district court concluded that any loss to owners is necessarily irreparable, because "the uniqueness of land is 'settled beyond the need for citation'" (opinion at 44, quoting from *United Church of the Medical Center v. Medical Center Commission,* 689 F.2d 693, 701 (7th Cir.1982)). Land may be unique, and injunctions to resolve ownership disputes about real property therefore may be appropriate, but this principle of state law is not a good reason to enjoin the operation of a state law. Illinois may if it wants decide to substitute cash for real property. States condemn and pay for land all the time; the Takings Clause of the fifth amendment supposes that money damages are a constitutionally adequate substitute for real property. If Chicago errs and razes a building without proper notice, or wrecks a structure that does not fit the terms of the law, it opens itself to an inverse condemnation action. Money will compensate the owner. It is not as if the buildings are the only lodgings of their owners: the Fast Track program deals in uninhabited edifices. Honeywood, the principal plaintiff, renovates run-down properties for profit, not for aesthetic delight; money is a perfect substitute for property to such a corporation. The district judge wrote of "the emotional repercussions of losing what at one time may have been the family home." Opinion at 44. But Honeywood does not experience emotions, and families that have moved to other dwellings lack any legal interest in preventing a city from treating empty shells as what they are. "Emotional repercussions" would not prevent Chicago from condemning the shells, paying the market price, and razing them; "emotional repercussions" therefore do not justify replacement of the inverse condemnation remedy with an injunction against demolition.

■ As for what Chicago stands to lose from an erroneous injunction: the district judge thought this side of the balance beam empty. When issuing the injunction, the judge opined that the public interest "in the preservation of valuable building stock" (opinion at 46) exceeds its interest in razing open and vacant buildings that may be staging points for crime. This amounts to nothing less than disagreement with the premise of the statute, a subject best left to legislators. Although the judge observed that the City could still obtain demolition orders from local courts, the legislative finding behind the fact-track program is that a requirement of litigation in every case—even when the owner has abandoned the property—delays the public benefit without producing an offsetting private benefit. Owners are entitled to elect litigation under the Fast Track program; when they do not do so, they convey a powerful message.

■ When addressing the City's motion for a stay pending appeal, the judge took a different approach. Instead of weighing for himself the pros and cons of fast-track demolition, the judge now wrote that the law has no benefits at all—at least none the court is obliged to acknowledge:

> The City argues that it is right to focus on accessibility because open and abandoned buildings may become breeding grounds for criminal activity. While this argument has a certain intuitive appeal, the City has not provided any actual evidentiary support for it. Building Commissioner Cherryl Thomas' affidavit on this topic is based almost entirely upon hearsay, and thus cannot be considered competent evidence. The advantages of summary demolition procedures as a crime-fighting tool are simply not supported by the current record.

Stay opinion at 12. The unarticulated premise of this approach is the proposition that a unit of government must demonstrate the benefits of its laws by evidence that persuades the judge. Yet it has long been established that a city or state need not do this. If a rational person could believe that the law has certain benefits, then the court must assume that it has those benefits. Enforcement of legislation is not contingent on convincing the judge of its value. A legislative

decision "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993). See also, e.g., *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 463–65, 101 S.Ct. 715, 723–25, 66 L.Ed.2d 659 (1981); *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979); *National Paint & Coatings Ass'n v. Chicago,* 45 F.3d 1124, 1127 (7th Cir.1995). The district court allowed that the Fast Track program has a "certain intuitive appeal". Just so. A rational person could believe that it facilitates the suppression of crime. It also may curtail risks of fire, which can spread to adjacent buildings, and the hazards run-down and open premises pose to children, who may enter and injure themselves. No more is necessary to show that an injunction will impose irreparable harm on the people of Chicago.

That harm must be borne if the program violates the Constitution. A sufficiently strong showing of a violation might have supported a preliminary injunction, had a class been certified. But such a strong demonstration has not been made out. The due process clause requires notice and an opportunity for a hearing. Chicago gives three forms of notice: posting at the property, publication, and mail to persons with known ownership interests. The district court concluded that this combination is satisfactory in principle. It nonetheless held that plaintiffs have a likelihood of success on three constitutional theories: (a) the opportunity for a pre-deprivation hearing is inadequate because the owner must initiate an action in state court and pay a $220 filing fee; (b) between 5% and 10% of fast-track demolitions may be erroneous; and (c) the program offends principles of substantive due process.

■ Take the last of these grounds first. We recently observed, when reversing an injunction against another of Chicago's regulatory programs:

> The fourteenth amendment contains an equal protection clause, and a due process clause, but no "due substance" clause. The word that follows "due" is "process."

This court has held repeatedly that economic regulation must be evaluated under equal protection principles, and that laws supported by a rational basis are within the power of the elected branches of government. *River Park, Inc. v. Highland Park,* 23 F.3d 164 (7th Cir.1994); *Saukstelis v. Chicago,* 932 F.2d 1171, 1173–74 (7th Cir.1991); *Chicago Board of Realtors, Inc. v. Chicago,* 819 F.2d 732, 741–42 (7th Cir.1987). "The doctrine that ... due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely ... has long since been discarded." *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963).

The doctrine that goes by the name "substantive due process" is not a rival to the established rational basis analysis of economic regulation. It is instead derived from the many constitutional rules that protect personal liberty from unjustified intrusions. The fact that it is a doctrine owing its existence to constitutional structure rather than a clear grant of power to the judiciary has led the Supreme Court to be cautious in its use. *Albright v. Oliver,* 510 U.S. 266, 271–72, 114 S.Ct. 807, 811–12, 127 L.Ed.2d 114 (1994) (plurality opinion); *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068–69, 117 L.Ed.2d 261 (1992). Only laws that affect "fundamental rights" come within the purview of this doctrine. See *Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 1446–47, 123 L.Ed.2d 1 (1993).

*National Paint,* 45 F.3d at 1129. The link between substantive due process and fundamental rights was reiterated just the other day in *Washington v. Glucksberg,* —— U.S. ——, ——, 117 S.Ct. 2258, 2267–68, 138 L.Ed.2d 772 (1997). Plaintiffs do not have—do not even *say* they have—a fundamental right to maintain "open and vacant" buildings that pose "an immediate and continuing hazard to the community". Razing nuisances, like killing diseased livestock and burning infected plants, is a time-honored use of a state's police power, see *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), accepted by even the harshest

critics of governmental regulation. E.g., Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 112–21, 229–36 (1985). The district judge did not say otherwise. Instead he reasoned that no conception of the public interest is "served by demolishing houses that have been substantially rehabilitated, or in otherwise mistakenly demolishing buildings." Opinion at 43. Well, of course *mistakes* in the implementation of a program don't serve the public interest, but errors are endemic to human activity. Surely the judge did not mean that any program that ever errs violates the Constitution. A program of slaughtering livestock to curtail the spread of disease is bound to kill some healthy animals. Governments atone for mistaken destruction of property by paying just compensation. Chicago must compensate owners injured by unwarranted demolitions. If it is willing to pay the piper, Chicago may call the tune free from any objection based on "substantive due process."

■ Back to the top. The first of the district court's three reasons for concluding that plaintiffs have a good shot at prevailing on the merits is that the opportunity for a pre-deprivation hearing is judicial rather than administrative, so that persons who are not entitled to proceed *in forma pauperis* must pay $220 up front to obtain a hearing. (The judge did not discuss whether a prevailing plaintiff gets the $220 back as part of costs.) The district judge recognized that this court has rejected a due process challenge to an essentially identical statute in Wisconsin. See *Baker v. Mueller*, 222 F.2d 180 (7th Cir.1955), cited with approval in *Pelfresne v. Williams Bay*, 917 F.2d 1017, 1023 (7th Cir.1990). But the judge wrote that *Baker* is poorly reasoned ("[t]he sum total of the court's discussion of the constitutionality of [the Wisconsin law] in *Baker* was three sentences", opinion at 39) and conflicts with a decision of another circuit, *McClendon v. Rosetti*, 460 F.2d 111 (2d Cir.1972), that the judge found more persuasive. Although the brevity of the exposition in *Baker* makes it hard to determine which constitutional objections were leveled against the state law, and therefore which ones were rejected, there is no similar problem in parsing *Graff v. Chicago*, 9 F.3d 1309 (7th Cir.1993) (en

banc). The operator of a newsstand contended that the City's rules for removing unlicensed vendors violated the Constitution because, among other reasons, the vendor had to initiate the process of judicial review. A majority concluded that a state may place this burden on a vendor, even given the special rules applicable to regulation that affects expression. 9 F.3d at 1323–25 (plurality opinion), (Flaum, J., concurring). Perhaps, despite the holdings in *Baker* and *Graff*, plaintiffs retain some room for argument. Their chances of success cannot be called rosy, however; $220 (which may be refundable) is small compared with both the value of real estate and the legal fees that, as a practical matter, owners incur whether the hearing is administrative or judicial, and whether the City or the owner initiates the hearing process. Plaintiffs' chances on this theory are not strong enough to justify a preliminary injunction obliterating the fast-track program.

■ At last we come to plaintiffs' best theory: that in operation Chicago's system makes so many mistakes that it is essential to establish additional rounds of notice and other safeguards. Achieving an acceptable error rate is an important element of the due process calculus under *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). See *Van Harken v. Chicago*, 103 F.3d 1346, 1351–53 (7th Cir.1997). Once again, however, we do not think that this is such a powerful argument that the strongly pro-defendant balance of error costs has been overcome.

Plaintiffs contend, and the district judge concluded, that some of their properties were demolished by mistake. Self-selection makes it impossible to learn from what happened to plaintiffs the frequency of errors in the whole program. So the district judge looked at two samples: 76 parcels included in a notice published on February 14, 1997, and the last 25 buildings actually demolished in 1996. The judge concluded that the files of the 76–parcel group contain 28 flaws, 7 of which are sufficiently serious that they may have led to erroneous demolition. Opinion at 31. (In the opinion denying a stay, the judge allowed that the number might be as low as 4, stay

op. at 10, but thought that such an error rate remains unconstitutionally high.)

 "May have" is less sure than "would have"; much happens after the initial notice, including another inspection and quality checks of the files. Many buildings on published lists are not demolished. Thus the 25–parcel sample of completed demolitions provides the acid test. The court wrote:

> We have carefully reviewed these files in the same manner as the 2/14/97 files. Out of a total of 25 files, we found two files with errors, both of which must be characterized as serious errors in the notification process. In both cases, the attorney compiling the [list of persons with ownership interests in the real estate] failed to contact a listed trustee for the names and addresses of the land trust's beneficiaries. These omissions may well have led to those with a beneficial interest in the property not receiving one of the required forms of notice—the Fast Track letter. No other errors appeared in this group of files.

Opinion at 31–32 (citation to the record omitted). What strikes us about this identification of "error" is that the Constitution does not require notice to persons who arrange their affairs to conceal their interests. Persons who hold property through land trusts rely on the trustees to receive and forward notices. Chicago notified the record owners of all 25 parcels. It is odd to say that persons who do not record their interests— often because they do not want their ownership to be known—have a constitutional entitlement to be tracked down and notified anyway. Beneficial owners may have a right to notice under the statute and ordinance, but the Constitution does not enforce state law. *Archie v. Racine,* 847 F.2d 1211, 1215–18 (7th Cir.1988) (en banc). The district judge did not cite any case establishing that the due process clause requires the government to send notice to beneficial, as opposed to legal, owners of real property. *Schluga v. Milwaukee,* 101 F.3d 60 (7th Cir.1996), which the district court did not mention, holds that notice to owners of record is constitutionally

adequate. What is more, the review of the files did not reveal whether the trustees notified the beneficial owners (as they should have). If all interested parties had actual knowledge, and the parcels were substantively eligible for demolition, where is the "error"?

In sum, the plaintiffs' best legal theory is not supported by this record; their remaining legal theories are weak; the irreparable costs of an erroneously granted injunction exceed the irreparable costs of an erroneous denial, and there is no legal support for relief affecting properties not owned by the plaintiffs. The preliminary injunction is

REVERSED.